1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                        **SOUTHERN DIVISION**

11

12   MICHAEL A. SKLAVER,                )      No. SA CV 17-415-PLA
                                        )
13            Plaintiff,                )      **MEMORANDUM OPINION AND ORDER**
                                        )
14       v.                             )
                                        )
15   NANCY BERRYHILL, ACTING            )
     COMMISSIONER OF SOCIAL             )
16   SECURITY ADMINISTRATION,           )
                                        )
17            Defendant.                )
     _____)
18

19                                   **I.**

20                             **PROCEEDINGS**

21            Plaintiff filed this action on March 9, 2017, seeking review of the Commissioner's denial of

22   his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

23   payments.  The parties filed Consents to proceed before a Magistrate Judge on March 13, 2017,

24   and April 13, 2017.  Pursuant to the Court's Order, the parties filed a Joint Submission

25   (alternatively "JS") on October 16, 2017, that addresses their positions concerning the disputed

26   issues in the case.  The Court has taken the Joint Submission under submission without oral

27   argument.

28

## II.

## <u>BACKGROUND</u>

Plaintiff was born on September 24, 1981. [Administrative Record ("AR") at 37, 570, 576.] He has past relevant work experience as a stock clerk. [AR at 36, 103-04.]

On June 21, 2010, plaintiff filed an application for SSI payments, alleging that he has been unable to work since May 30, 2004. [AR at 21, 570.] After that application was denied, on May 9, 2011, plaintiff filed an application for DIB, alleging the same disability onset date of May 30, 2004. [AR at 21, 576.] On June 9, 2012, a hearing was held before an Administrative Law Judge ("ALJ"), and supplemental hearings were held on November 29, 2012, and April 2, 2013. [AR at 177-278.] The ALJ issued a decision on May 17, 2013, denying plaintiff's claims. [AR at 21, 284-95.] On November 26, 2013, the Appeals Council vacated that decision and remanded the case with instructions for further proceedings. [AR at 21, 303-05.]

A hearing before a different ALJ was held on May 6, 2014, but was continued because the medical expert did not have the opportunity to review a large volume of new medical records submitted by plaintiff shortly before the hearing. [AR at 21, 127-76.] Before the continuance, however, plaintiff amended his alleged onset date to August 31, 2003. [AR at 21, 129-30.] A hearing before a different ALJ was then held on January 7, 2015, at which time plaintiff appeared represented by an attorney, and testified on his own behalf. [AR at 21, 47-126.] A medical expert ("ME"), a vocational expert ("VE"), and plaintiff's father also testified. [AR at 59-100, 102-08, 109-18.] On March 30, 2015, the ALJ issued a decision concluding that plaintiff was not under a disability from August 31, 2003, the alleged onset date, through March 30, 2015, the date of the decision. [AR at 21-38.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 16-17.] When the Appeals Council denied plaintiff's request for review on January 12, 2017 [AR at 1-5], the ALJ's decision became the final decision of the Commissioner. <u>See</u> <u>Sam v. Astrue</u>, 550 F.3d 808, 810 (9th Cir. 2008) (<u>per</u> <u>curiam</u>) (citations omitted). This action followed.

/

/

/

# III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits. The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Id. (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

# IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

## A. THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied. Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied. Id.  The claimant has the burden of proving that he is unable to perform past relevant work. Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established. Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy. Id.  The determination of this issue comprises the fifth and final step in the sequential analysis. 20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

## B. THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS

At step one, the ALJ found that plaintiff had engaged in substantial gainful activity during

the period of September 2014 to the date of the decision, March 30, 2015,[1] but that there had been a continuous 12-month period during which plaintiff did not engage in substantial gainful activity. [AR at 24.] At step two, the ALJ concluded the following:

• From August 31, 2003, the alleged onset date, through October 15, 2013, plaintiff had the severe impairments of schizoaffective disorder with history of bipolar disorder, as well as polysubstance abuse, and that during that time period, plaintiff's impairments, including the substance abuse disorders, "met sections 12.09 [polysubstance abuse, intermittent] with 12.03 [schizophrenia spectrum and other psychotic disorders][2] and 12.04 [bipolar disorder] of 20 CFR Part 404, Subpart P, Appendix 1." [AR at 25.] She also determined that if plaintiff stopped his substance use during this time period, the remaining limitations would cause more than a minimal impact on plaintiff's ability to perform basic work activities, and plaintiff would continue to have a severe impairment or combination of impairments, but the impairment or combination of impairments would not meet or medically equal a Listing [AR at 27]; thus, she concluded, plaintiff's substance use "is a material factor to [plaintiff's] mental status," because when he "is using drugs, he is completely nonfunctional," and when he is medication compliant and drug-free, he does not meet or functionally equal any of the requirements of the Listings [AR at 27, 29]; and

• Beginning on October 16, 2013, plaintiff had the severe impairments of schizoaffective disorder and anxiety disorder. The ALJ found that plaintiff's substance abuse was in remission since that date, "and is not material to the determination of disability since that date." [AR at 27.]. At step three, the ALJ

[1] The ALJ also concluded that plaintiff met the insured status requirements of the Social Security Act, but only through December 31, 2007. [AR at 24.]

[2] Although the ALJ attributes her finding that plaintiff met Listing 12.03 to Dr. Malancharuvil, the ME to whose opinion the ALJ gave "significant weight," Dr. Malancharuvil actually testified that plaintiff met Listing **12.08**, as well as Listing 12.09 and 12.04. He did not testify as to Listing 12.03. Whether plaintiff met Listing 12.03 or 12.08 is not a factor that affects this Court's decision.

further determined that during this time period plaintiff did not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [AR at 26-27.]

The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform a full range of work at all exertional levels, as follows:

> From August 31, 2003 through October 15, 2013, if [plaintiff] stopped the substance use, [he] would have the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: capable of moderately complex tasks, meaning SVP [specific vocational preparation] of 3-4 in an object-oriented work setting; unable to perform work involving hazardous machinery or be responsible for the safety of others. Beginning October 16, 2013, [plaintiff] has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: can understand and remember simple routine tasks; carry out short and simple instructions; make judgments and decisions consistent with simple routine duties; unable to perform work with high production quotas or rapid assembly line work; could not be responsible for the safety of others; and could not perform work around hazardous machinery.

[AR at 28.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that from August 31, 2003, through October 15, 2013, if plaintiff stopped the substance use, he would be able to perform his past relevant work as a stock clerk. [AR at 36.] Beginning October 16, 2013, however, the ALJ found that plaintiff was unable to perform his past relevant work. [AR at 37.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that beginning October 16, 2013, there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "hospital cleaner" (Dictionary of Occupational Titles ("DOT") No. 323.687-010), "cleaner" (DOT No. 323.687-014), and "linen room attendant" (DOT No. 222.387-030). [AR at 31, 76-79.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of August 31, 2003, through March 30, 2015, the date of the decision. [AR at 38.]

---

[3]     RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

# V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when she: (1) considered the opinions of plaintiff's treating providers Dr. Eric Speare, Dr. Rebecca Hedrick, Dr. Amado, and Dr. L.O. Mallare; (2) failed to adequately consider the materiality concerning substance use and the ruling addressing substance use; (3) rejected plaintiff's subjective symptom testimony; and (4) failed to properly consider lay witness statements. [JS at 4.] As set forth below, the Court agrees with plaintiff, in part, and remands for further proceedings.

## A.    MATERIALITY OF SUBSTANCE USE

Under the Social Security Act, "[a]n individual shall not be considered disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). "The key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether an individual would still be found disabled if [he or she] stopped using alcohol or drugs." Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir.1998) (internal quotation marks and ellipsis omitted); see 20 C.F.R. §§ 404.1535, 416.935 (explaining how the Commissioner determines whether drug addiction or alcoholism is a contributing factor); see also Social Security Ruling ("SSR")[4] 13-2p (explaining how the Commissioner evaluates cases involving drug addiction and alcoholism).

The ALJ must first conduct the sequential five-step inquiry used to evaluate disability "without separating out the impact of alcoholism or drug addiction. If the ALJ finds that the claimant is not disabled under the five-step inquiry, then the claimant is not entitled to benefits and there is no need to proceed with the analysis under 20 C.F.R. §§ 404.1535 or 416.935."

---

[4]    "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

Bustamante v. Massanari, 262 F.3d 949, 955 (9th Cir. 2001); see 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); SSR 13-2p. If, however, "the ALJ finds that the claimant is disabled and there is medical evidence of his or her drug addiction or alcoholism, then the ALJ should proceed under §§ 404.1535 or 416.935 to determine if" drug or alcohol use is a contributing factor material to the disability determination. Bustamante, 262 F.3d at 955 (internal quotation marks and brackets omitted); see 20 C .F.R. §§ 404.1535, 416.935; SSR 13-2p.

A two-step analysis is required to determine whether drug addiction or alcoholism is a material contributing factor. First, the ALJ must determine which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol. Second, the ALJ must determine whether the remaining limitations would still be disabling. If so, then the claimant's drug addiction or alcoholism is not a material factor to the determination of disability. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2); Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007). The claimant bears the burden of proving that drug addiction and alcoholism are not contributing factors material to his or her disability, in that he or she would remain disabled if the drug and alcohol use ceased. Parra, 481 F.3d at 748.

Here, the ALJ accepted the ME's opinion that drug and alcohol use was "a material factor contributing to [plaintiff's] mental problems through September 2013," and found that from August 31, 2003, through October 15, 2013, if plaintiff stopped the substance use, "the remaining limitations would cause more than a minimal impact on [his] ability to perform basic work activities; therefore [he] would continue to have a severe impairment or combination of impairments." [AR at 27.] Additionally, she determined that if plaintiff stopped the substance use, "the severe impairment or combination of impairments would not meet or medically equal any of the impairments" in the Listing, and that plaintiff had the RFC to perform a full range of work with certain non-exertional limitations during that time period. [AR at 27-28, 34.]

Plaintiff contends that the ALJ failed to properly consider the evidence of substance use in connection with SSR 13-2p, which "discusses situations where there is improvement during

hospitalizations that does not necessarily prove that substance abuse is material."[5]  [JS at 23.] He argues that the ALJ failed to properly consider the following medical opinions:  (1) the July 28, 2004, opinion of Eric Speare, M.D. that plaintiff was unable to work [JS at 2-3, 7 (citing AR at 1519-20)]; (2) the February 14, 2006, Medical Disorder Questionnaire completed by Rebecca Hedrick, M.D., a physician at Royale Therapeutic Residential Center ("Royale TRC"), who opined that plaintiff is disabled and that his functionality would not improve with medication compliance and sobriety [JS at 8-10, 11-13 (citing AR at 909-13)]; (3) the October 14, 2010, opinion of State Agency physician H. Amado, M.D., finding moderate limitations in plaintiff's social functioning and maintaining concentration, persistence, and pace, and Dr. Amado's finding of "several moderate limitations in a Mental Residual Functional Capacity Assessment," which plaintiff defined at the May 6, 2014, hearing as "20 percent below the average," because it was not defined in the forms [JS at 14-15, 16-17 (citing AR at 210-11, 1005-20)]; and (4) the July 2006 opinion of State Agency physician, L.O. Mallare, M.D., that plaintiff met Listing 12.04B because he has two marked limitations in the "B" criteria, and drugs and alcohol "are not material because they are in early remission."  [See JS at 17-19, 21-23 (citing AR at 914-24).]

Plaintiff further submits that the ME, whom the ALJ relied on in making the finding that plaintiff's drug use was material, testified that with "combined drug use, intermittent as it is but . . . significant and heavy, and medication noncompliance -- combined together, [plaintiff] would

---

[5]    SSR 13-2p provides in part that "[i]mprovement in a co-occurring mental disorder in a highly structured treatment setting such as a hospital . . . may be due at least in part to treatment for the co-occurring mental disorder, not (or not entirely) the cessation of substance use.  We may find that DAA [drug and alcohol abuse] is not material depending on the extent to which the treatment for the co-occurring mental disorder improves the claimant's signs and symptoms. If the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorder(s), we will find that DAA is not material . . . ." SSR 13-2p, 2013 WL 621536, at *12.  SSR 13-2p also recognizes that a "co-occurring mental disorder may appear to improve because of the structure and support provided in a highly structured treatment setting [and] we may find that a claimant's co-occurring mental disorder(s) is still disabling even if increased support or a highly structured setting reduce the overt symptoms and signs of the disorder."  Id.  In light of these principles, "a record of multiple hospitalizations, emergency department visits, or other treatment for the co-occurring mental disorder -- with or without treatment for DAA -- is an indication that DAA may not be material even if the claimant is discharged in improved condition after each intervention." SSR 13-2p, 2013 WL 621536, at *13.

become nonfunctional," suggesting that "it is non-compliance and drug use, not just drug use," that renders plaintiff nonfunctional. [JS at 24.] Plaintiff argues that the ALJ failed to consider medication non-compliance despite it being a contributing factor in his mental health issues. [Id.] Plaintiff also references the testimony of Dr. Rath, the ME who testified at the prior hearing on April 2, 2013, that "he saw no evidence that marijuana and cocaine were a contributing factor after 2011." [Id. (citing AR at 181).] Plaintiff notes that Dr. Rath also testified that when plaintiff goes off his medications he decompensates, but improves when he goes back on his medications. [Id. (citing AR at 181 (stating that "the problem with the case has always been that [plaintiff] goes off his medicine and decompensates. When he gets on his medicine, then he's fine again. And there's probably at least six or eight times that's . . . happened, in the record").] Plaintiff submits that the ALJ failed to properly consider the evidence on this issue, including the medical opinion evidence of Dr. Rath, Dr. Mallare, and Dr. Hedrick, when the ALJ found, contrary to the medical opinions, that plaintiff's substance use was "material." [JS at 28.] Finally, plaintiff argues that the ALJ failed to properly consider plaintiff's testimony regarding the efficacy of his medications, his use of illegal drugs to self-medicate when he feels the prescribed medications are not working, and that when experiencing a manic episode, he exhibited poor decision making, including resorting to illegal drugs. [JS at 24-25.] In short, he submits that he "was already non-functional when his medications lost their effectiveness [and] [t]he substance abuse does not change this fact." [JS at 25.]

Defendant contends that the ALJ's finding that plaintiff's substance use was material to his disability through October 15, 2013, was supported by substantial evidence and fully consistent with SSR 13-2p. [JS at 26.] Defendant also contends that the ALJ properly relied on the ME's testimony because the ME reviewed "the longitudinal evidence showing pervasive use of illegal substances through at least September 2013," and his opinion was consistent with that evidence. [Id.] Defendant further argues that plaintiff's argument that his "condition was due to excusable non-compliance because of poor decision making or lack of effectiveness of his medication is entirely specious," as the record reflects -- as found by the ALJ -- that with medication compliance and abstinence from drugs, plaintiff's condition was stable and under control to the point that he

is able to work.  [JS at 26-27 (citing AR at 197).]  Defendant states that Dr. Rath testified, "consistent with other doctors' observations, 'medication has never failed to hold [plaintiff's] symptoms in abeyance,'" and "[t]he ALJ reached the same conclusion based in particular on the evidence that, with medications compliance and abstinence from drugs, Plaintiff's condition was stable and under control to the point that he [was] able to work."  [JS at 27 (citing AR at 24-37).] Defendant also submits that plaintiff's argument that he was "mentally unable to comply" with his medication regime "is belied by the evidence showing that [he] had normal mental status including normal judgment and insight with medications compliance and abstinence from drugs."  [JS at 27 (citing AR at 2193, 2207, 2314, 2360, 2383, 2427, 2490, 2558).]

Plaintiff responds that the ALJ failed to properly consider the evidence of substance use in connection with SSR 13-2p because she failed to properly consider all the evidence, including the opinions of Dr. Mallare, Dr. Rath (the ME at the earlier hearing), and Dr. Hedrick, as well as plaintiff's testimony that plaintiff only took illegal drugs because his medications were not working, as evidenced by the fact that he would stop taking his medications because he felt he did not need them, i.e., he was self-medicating.  [JS at 27-28.]  Plaintiff also submits that "compliance would not have made him more functional because it was not until around July 2013 when he was finally put on the right medication, Resperal, that his level of functioning improved."  [JS at 28 (citing AR at 94).]  Plaintiff argued at the hearing that the ME, to whom the ALJ gave significant weight, failed to take into consideration the periods when plaintiff was under treatment, without access to any drugs, and was nevertheless "still having these severe problems."  [See AR at 67.]

### 1.    Medical Opinions

#### a.    Legal Standard

"There are three types of medical opinions in social security cases:  those from treating physicians, examining physicians, and non-examining physicians."  Valentine v. Comm'r Soc. Sec.

Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527.[6] The Ninth Circuit has recently reaffirmed that "[t]he medical opinion of a claimant's treating physician is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record.'" Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(c)(2)).  Thus, "[a]s a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison, 759 F.3d at 1012 (citing Ryan, 528 F.3d at 1198); Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010).  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Trevizo, 871 F.3d at 675 (citing Ryan, 528 F.3d at 1198).  "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. (citing Ryan, 528 F.3d at 1198).  When a treating physician's opinion is not controlling, the ALJ should weigh it according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of examinations, whether the physician's opinion is supported by and consistent with the record, and the specialization of the physician. Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6).  The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

---

[6]    The Court notes that for all claims filed on or after March 27, 2017, the Rules in 20 C.F.R. § 404.1520c (not § 404.1527) shall apply.  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c.  Thus, the new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule. See 20 C.F.R. § 404.1520c; see also 81 Fed. Reg. 62560, at 62573-74 (Sept. 9, 2016).  However, the claim in the present case was filed before March 27, 2017, and the Court therefore analyzed plaintiff's claim pursuant to the treating source rule set out herein. See also 20 C.F.R. § 404.1527 (the evaluation of opinion evidence for claims filed prior to March 27, 2017).

stating his interpretation thereof, and making findings." Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998). The ALJ "must set forth his own interpretations and explain why they, rather than the [treating or examining] doctors', are correct." Id.

Although the opinion of a non-examining physician "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency physicians are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining medical experts "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).

### b. Appeals Council Remand Order

After reviewing the previous May 17, 2013, decision, the Appeals Council remanded with instructions to address the medical opinions of treating physicians Dr. Speare, Dr. Kosmicki, and Dr. Milofsky, noting that the decision did not provide a discussion identifying their specific opinions "and their opinions that differ[] from Dr. Rath." [AR at 303.] The Appeals Council specifically found that the ALJ did not "weigh medical source opinions . . . and provide appropriate explanations for accepting or rejecting such opinions." [Id.] The Appeals Council noted that "the decision does not provide any further rationale with discussion of the medical evidence of record to support the basis of generally discrediting their medical opinions." [Id.] The Appeals Council further observed that the decision did not "acknowledge or address the medical opinions of State agency medical consultants Dr. Mallare . . . and Dr. Amado," whose opinions pertained to plaintiff's "functional mental abilities within the time period at issue." [AR at 304 (citing AR at 914-24, 1019-20).] The Appeals Counsel specifically remarked that "notably," in his July 25, 2006, report, Dr. Mallare had opined "that the severity of [plaintiff's] mental impairments met Listing 12.04 [and] further indicated

that drug abuse and alcohol was *not* a factor material to the disability determination." [Id. (citing AR at 914-24 (emphasis added)).] The Appeals Council remand order also noted that "Dr. Mallare's opinion suggests that the severity of [plaintiff's] mental impairments, absent drug abuse and alcohol, is more limiting than was assessed in the decision." [Id.]

### 2. Dr. Speare

Plaintiff was hospitalized from July 3, 2004, through August 16, 2004. [AR at 824-56.] On July 28, 2004, Dr. Speare prepared a "Physician's Certification of Child/Dependent's Disability," in which he stated that plaintiff, whom he described as being "currently hospitalized in locked psychiatric facility -- currently psychotic," was incapable of self-support due to disability. [AR at 1519.] He stated that plaintiff's prognosis was "Fair with continued treatment." [AR at 1520.]

As noted above, the Appeals Council remanded for the specific reason that the previous ALJ had not provided a discussion identifying Dr. Speare's opinion and how it differed from the opinion of Dr. Rath and, therefore, had not provided an appropriate explanation for accepting or rejecting that opinion. [AR at 303.] On remand, the ALJ gave "significant weight" to Dr. Speare's opinion regarding plaintiff's "mental status at that time, as well as his opinion regarding [plaintiff's] prognosis, because, as subsequent treatment records have shown, [plaintiff] did improve with continued treatment." [AR at 29.] The ALJ further noted that plaintiff had been "hospitalized on numerous occasions as a danger to himself and others; however substance abuse and/or medication noncompliance was documented in every instance through September 2013." [Id.] The ALJ also commented on the fact that the Administration had found plaintiff disabled in December 2005, but that the decision "was not effectuated because [plaintiff] could not be located as he was under a conservatorship and locked up." [AR at 30.] Plaintiff argued to the ALJ that a finding of disability at that time is evidence that drug use is not material to plaintiff's disability. [AR at 30, 64-67.]

Plaintiff argues that the ALJ failed to consider Dr. Speare's opinion that plaintiff was unable to work. [JS at 2 (citing AR at 1519).] He also contends that Dr. Malancharuvil's testimony suggested that non-compliance and drug use, and not just drug use, contributed to plaintiff's

mental health issues.  [JS at 27-28 (citing AR at 93).]  He argues that on April 2, 2013, Dr. Rath, the previous medical expert, testified that he saw no evidence that marijuana and cocaine were a contributing factor after 2011.  [JS at 28 (citing AR at 181).]  Defendant responds that the ALJ "duly considered" Dr. Speare's opinion and "gave it great weight with regard to Plaintiff's condition and prognosis at that time when Plaintiff was hospitalized in a locked psychiatric facility due to noncompliance with prescribed medications and/or substance abuse."  [JS at 6 (citing AR at 825, 830, 1519-20).]

However, the records cited to by the ALJ for the period of hospitalization relating to Dr. Speare's report reflect *only* noncompliance with medications, and not -- as impliedly asserted by the ALJ and defendant -- that his hospitalization (at least on that occasion) was preceded by substance use.  [See AR at 825 (noting that plaintiff was not taking his prescribed medication regularly), 830 (plaintiff was "again admitted" after a previous twelve-day stay that had ended half a month earlier and although he had been prescribed certain medications on discharge from the prior stay, he "apparently became noncompliant and again became psychotic").]  Indeed, one of the corresponding treatment notes reflects that plaintiff reported on admission that "*they* told [him] to" stop taking his medications but he was unable to "say who '*they*' are" [AR at 828 (emphases added)]; notably, upon re-hospitalization, the laboratory tests for amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine, PCP, and opiates, all came back "negative."  [AR at 835-36.]  Additionally, although the ALJ commented on the Administration's December 2005 finding of disability, she appears to have discounted that finding, in part, by referencing and discounting Dr. Mallare's *2006* opinion.  [AR at 30; see also discussion supra regarding Dr. Mallare's opinion.]  She also noted that the 2005 decision "was never effectuated and [plaintiff] never received disability payments because he was found to be a felon fleeing to avoid trial, jail, prison or custody or violating a condition of parole."  [AR at 30-31.]  However, as plaintiff explained at the hearing, although a warrant had issued, he was unable to appear in court because he was in the locked facility under a conservatorship on the date of the court appearance.  [AR at 68-69.]  He also testified that the warrant was later resolved.  [AR at 69.]

An ALJ must consider all of the relevant evidence in the record and may not point to only

those portions of the records that bolster his findings.  See, e.g., Holohan, 246 F.3d at 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others).  As the Ninth Circuit recently explained, with respect to mental health issues, "symptoms wax and wane in the course of treatment."  Garrison, 759 F.3d at 1017.  "Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  Id., 759 F.3d at 1017 (citing Holohan, 246 F.3d at 1205); see also Scott v. Astrue, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the] treatment notes.  Those notes show that although [plaintiff] had improved with treatment, [he] nevertheless continued to frequently experience bouts of crying and feelings of paranoia.  The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").  Thus, "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of [his] symptoms."  Garrison, 759 F.3d at 1017 (citing Ryan, 528 F.3d at 1200-01); see also Holohan, 246 F.3d at 1205 ("[The treating physician's] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect [his] ability to function in a workplace.").

Here, the ALJ acknowledged plaintiff's schizoaffective disorder with history of bipolar disorder.  She also acknowledged plaintiff's numerous hospitalizations since 2001, usually due to manic behavior.  She relied on the testimony of Dr. Malancharuvil, a Board certified clinical psychologist, and found that although he had not examined plaintiff, he reviewed the medical evidence of record and was present to hear plaintiff's testimony; he "highlighted numerous entries in the medical records that support his opinions"; and "[m]ost importantly, [his] opinions are reasonable and consistent with the objective medical evidence."  [AR at 32.]  She did not, however, provide a specific and legitimate reason for crediting Dr. Malancharuvil's testimony over

that of plaintiff's treating physician, Dr. Speare.

Based on the foregoing, remand is warranted on this issue.

### 3. Dr. Mallare

In his July 25, 2006, report [AR at 914-24], Dr. Mallare, a State agency reviewing physician stated the following:

> [Plaintiff] has two 5150 admissions one in 1/05 and the other 10/05 at South Coast. Admission of 10/05 [plaintiff] stayed there until 1/06, when he was transferred to Royal[e] TRC. Per Social worker, [plaintiff] needs constant supervision. He is unable to maintain concentration or remember. He becomes anxious easily.
>
> SEE CONSULT. LONG HX [history] of MI [mental illness] W/REPEATED ADMISSIONS; HX OF SUBST. DEPENDENCE, CURRENTLY IN EARLY REMISSION WHILE IN A PLACEMENT. CONTINUE TO HAVE BIPOLAR SX [symptoms] W/POOR COGNITIVE FUNCTIONING AND JUDGMENT. AT PRESENT ON CONSERVATORSHIP.
>
> MEETS 12.04 AB[.] DAA NOT MATERIAL.

[AR at 924.]

In her decision, the ALJ gave "little weight" to Dr. Mallare's opinion "regarding [plaintiff's] substance abuse not being material to the determination of disability." [AR at 33.] She stated the following as support for her "disagreement" with Dr. Mallare's opinion:

> Dr. Mallare's reasoning assumed "early remission" of drug use and conservatorship. However, the records document continued drug use and, while [plaintiff] may have had a conservator appointed in December 2005, he had been off his medications, and he had been on a three-month methamphetamine binge, using it every day, just before admission. [He] had been on conservatorship before with his mother, from August 2004 until July 2005; yet he reportedly used marijuana daily from age 19 until 2005, and he was positive for methamphetamine upon admission. Thus, Dr. Mallare's opinion is not supported by the medical evidence of record.

[Id. (citing AR at 924).]

Substantial evidence does not support the ALJ's decision to give "little weight" to Dr. Mallare's opinion. First, Dr. Mallare did not "assume" early remission of drug use -- because plaintiff was actually hospitalized from October 2005 through January 2006, and then was transferred to Royale TRC, it was reasonable for Dr. Mallare to find that plaintiff had not been using drugs during that placement -- yet, despite plaintiff's abstinence, Dr. Mallare still found that

plaintiff's bipolar symptoms continued.  Additionally, Dr. Mallare specifically modified his statement regarding early remission by stating that there was "early remission *while in a placement*," i.e., while plaintiff was a resident at South Coast Medical Center and then upon transfer to Royale TRC, just shortly before Dr. Mallare issued his report.  [AR at 924 (emphasis added).]  Next, records showing renewed substance use *after* plaintiff left that placement do not serve to discount Dr. Mallare's opinion of early remission "while in a placement" at the time he prepared his report.  Third, as observed by Dr. Mallare, despite the fact that plaintiff had been in the placement since October 26, 2005, and was not transferred to Royale TRC until January 2006, his bipolar symptoms continued throughout his hospitalization.

Next, the ALJ inexplicably "linked" plaintiff's purported "conservatorship . . . with his mother, from August 2004 until July 2005" with the fact that plaintiff "reportedly used marijuana daily from age 19 until 2005, and he was positive for methamphetamine upon admission" in October 2005, as well as his December 2005 conservatorship with the fact that "plaintiff had been off his medications, and . . . had been on a three-month methamphetamine binge," just before his October 2005 admission.  [AR at 33.]  There simply is no logical connection between these conservatorships, the hospitalizations, and Dr. Mallare's report -- indeed, during the conservatorships referenced, plaintiff was not hospitalized in a facility for the entire period.

Finally, to the extent that the ALJ impliedly rejected Dr. Mallare's opinion because it was contradicted by Dr. Malanchuruvil, which she did not explicitly state, she did not weigh the two opinions based upon any of the factors that are relevant to weighing these two opinions -- including their specializations.  See Trevizo, 871 F.3d at 676; see 20 C.F.R. § 404.1527(c)(2)-(6).  Dr. Mallare is a Board certified psychiatrist, while Dr. Malancharuvil is a Ph.D. clinical psychologist.

Based on the foregoing, the ALJ did not provide specific and/or legitimate reasons to discount Dr. Mallare's opinion, and remand is warranted on this issue.

**4.   Dr. Hedrick**

In a February 14, 2006, Mental Disorder Questionnaire Form [AR at 909-13], Dr. Hedrick, plaintiff's treating psychiatrist at Royale TRC, who had treated him 4 days a week since January

16, 2006, noted that since the age of 20 (in 2001), plaintiff had been hospitalized five times. [AR at 909.] Plaintiff reported to her that each of his admissions had been preceded by indulging in marijuana or methamphetamines, and that he "admitted to extensive daily use of MJ & Methamph . . . [and] Occ. [alcohol]." [AR at 909-10.] Despite the fact that plaintiff had been hospitalized for treatment since October 2005, she reported that plaintiff was currently depressed, emotionally withdrawn, and isolated [AR at 911], and had no insight and poor judgment regarding "impact of drug abuse on his mental health." [AR at 909.] Dr. Hedrick also reported plaintiff was on a full conservatorship and at that point had "impairments in executive functioning, serial planning, following directions, [and] concentration"; "some oppositional/defiant tendencies & would likely have difficulty interacting with supervisors"; as well as a "long hx of not being able to keep [a] job for long [secondary to] drug abuse *and* manic [symptoms]." [AR at 912 (emphasis added).] She indicated diagnoses of bipolar disorder, with the most recent episode being "manic severe with psychotic features," methamphetamine dependence, and marijuana dependence, and stated that plaintiff's prognosis is "Poor, unlikely to improve." [AR at 913.]

Plaintiff argues that Dr. Hedrick's opinion, which was the basis for Dr. Mallare's opinion, demonstrates that substance use was not material. [JS at 9 (citing AR at 924).] He notes that although Dr. Hedrick reported mood stabilization with medications, she also reported ongoing "issues *despite* medication compliance," including those noted above. [Id. (citing AR at 909-13) (emphasis added).] Plaintiff submits, therefore, that Dr. Hedrick's opinion supports that functionality did not improve with medication compliance "because it did not improve with compliance and sobriety," while plaintiff was hospitalized, i.e., "even with compliance [plaintiff] had ongoing issues, and his functionality had not improved." [JS at 8, 9.] Plaintiff argues that the ALJ's failure to "discuss or consider" Dr. Hedrick's opinion is error because she is a treating source, who first examined plaintiff on January 16, 2006, and plaintiff then had "four days a week visits up to February 14, 2006." [JS at 9 (citations omitted).] Plaintiff also observes that Dr. Hedrick rendered her opinion in early 2006, "during a period of sustained sobriety starting in October of 2005," and that the ALJ's reference to records that document "continued drug use," was "misplaced because the ALJ failed to provide any evidence of continuing substance abuse

as alleged," in the records cited to by the ALJ, other than the three-month methamphetamine binge *prior* to plaintiff's October 2005 hospitalization. [JS at 9-10 (citing AR at 884).]

Defendant concedes that the ALJ did not consider Dr. Hedrick's opinion. [JS at 10-11.] Defendant argues, however, that Dr. Hedrick's opinion reflects, among other things, that plaintiff's October 2005 hospitalization "was brought about by Plaintiff's drug abuse." [JS at 10 (citing AR at 909-10).] Defendant also suggests that Dr. Hedrick's opinion was consistent with Dr. Malancharuvil's testimony and that any error in failing to discuss Dr. Hedrick's opinion was harmless because Dr. Hedrick "offered her opinion after having seen Plaintiff for less than a month whereas Dr. Malancharuvil relied on the record through September 24, 2013," and "other [unspecified] doctors agreed that Plaintiff's problems were rooted in his drug abuse and related to non-compliance." [JS at 11 (citations omitted).]

Although defendant may be attempting to imply that Dr. Hedrick also found plaintiff's drug use to be material -- which she did not find -- the only consistency between Dr. Hedrick's opinion and Dr. Malancharuvil's testimony is plaintiff's diagnosis of substance dependency. Additionally, defendant's argument that Dr. Hedrick's opinion reflects that plaintiff's October 2005 hospitalization was "brought about" by his drug use, is not accurate. Dr. Hedrick referred to plaintiff's drug use as having an "*impact* . . . on his mental health," and not as the determining factor in his October 2005 hospitalization. [AR at 909.] In fact, Dr. Hedrick recognizes the interplay between plaintiff's psychosis, mania, and drug use. [Id.] She also clearly describes plaintiff's continuing symptoms -- such as depression, flat affect, anhedonia, feelings of hopelessness, emotional withdrawal, poor communication, intimidating behaviors toward other residents at the hospital, poor concentration secondary to distraction, and oppositional/defiant behaviors -- without reference to any contribution by plaintiff's substance use or non-compliance -- during a lengthy period of hospitalization when plaintiff did not have access to drugs and was compliant with medications. [See, e.g., 909-13.] Further, Dr. Hedrick's February 14, 2006, report is consistent with Dr. Mallare's subsequent report in which he deemed plaintiff to be in "early remission" from substance abuse as a result of his placement in a facility.

Moreover, "[l]ong-standing principles of administrative law require [this Court] to review the

ALJ's decision based on the reasoning and factual findings offered *by the ALJ* -- not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (emphasis added, citation omitted); Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir. 2001) ("[W]e cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision."); Garrison, 759 F.3d at 1009.  In addition to having no merit as discussed above, the reasons suggested by defendant for rejecting Dr. Hedrick's opinions were not given by the ALJ in the decision.  See Trevizo, 862 F.3d at 997 (citation omitted).  Neither is there any indication that the ALJ failed to consider or discuss Dr. Hedrick's opinion because she weighted it according to factors such as the nature, extent, and length of the physician-patient working relationship, the frequency of Dr. Hedrick's examinations, whether Dr. Hedrick's opinion is supported by and consistent with the record, and Dr. Hedrick's specialization as a psychiatrist.

Based on the foregoing, the ALJ's failure to consider or discuss Dr. Hedrick's opinion was not harmless error and remand is warranted on this issue.

**5.     Dr. Amado**

Dr. Amado, a State agency physician, completed the State agency forms on or about October 4, 2010. [AR at 1005-20.]  Dr. Amado found "moderate" limitations in social functioning, and in maintaining concentration, persistence, and pace, as well as several moderate limitations in the Mental Residual Functional Capacity Assessment he completed.  [AR at 1005-06, 1016.] Plaintiff contends that although "moderate" is not defined in that form, counsel at the May 2013 hearing defined "moderate as 20 percent below the average." [JS at 14.]  The VE at that hearing opined that based on that definition, plaintiff would not be capable of engaging in any work.  [Id. (citing AR at 210-11).]  Plaintiff complains that the ALJ failed to give consideration to "the opinion of the vocational expert indicating that [plaintiff] is disabled based upon the opinion of Dr. Amado with moderate defined by counsel."  [Id.]

Defendant notes that Dr. Amado also opined that despite the moderate limitations he assessed, plaintiff could still perform entry-level work.  [JS at 15.]

1    Based on the foregoing, the Court finds remand is not warranted on this issue.

2

3    **B.    SUBJECTIVE SYMPTOM TESTIMONY AND LAY WITNESS TESTIMONY**

4    Plaintiff argues that the ALJ failed to properly consider his testimony regarding the

5    following: plaintiff's use of drugs as self-medicating, especially when he started to experience an

6    episode of mental breakdown when his medications were not working; his use of

7    methamphetamines only about "half-a-dozen times" between 2004 and 2012; his use of cocaine

8    only twice -- in 2002 and 2011; and his marijuana use, which has been intermittent, when

9    compared with the period of time that he did not use.  [JS at 29 (citing AR at 81-87).]

10    The ALJ found plaintiff was "less than fully credible."  [AR at 35.]  She noted that although

11    plaintiff alleged his impairments prevent him from working, he described "everyday activities that

12    include playing around on the computer, golfing, biking, going to lunch with friends, laying out at

13    the pool, preparing meals, taking out the trash, watering the grass, cleaning the kitchen, going to

14    the movies, church, medical appointments, and meetings," attending college and obtaining an AA

15    degree in 2003, and since September 2014 working "8 hours a day, six days a week." [Id. (citing

16    AR at 694-71).]  The ALJ stated that "the physical and mental capabilities requisite to performing

17    many of the tasks described . . . as well as the social interactions replicate those necessary for

18    obtaining and maintaining employment." [Id.]  She did not, however, provide any showing as to

19    how this was so.  Brown-Hunter v. Colvin, 806 F.3d 487, 493-94 (9th Cir. 2015) (the ALJ must

20    identify the testimony he found not credible and "link that testimony to the particular parts of the

21    record" supporting his non-credibility determination).  Nor did the decision reflect the amount of

22    time spent or the reminders plaintiff testified that he needed in order to perform some of these

23    activities.  [AR at 694-71.]  The ALJ also determined that plaintiff's "numerous psychiatric

24    hospitalizations," were clearly "linked to active substance abuse involvement, evidenced by the

25    normalization of mental status examination and behavior by the time he was discharged from the

26

27

28

22

inpatient facility with presumptive enforced sobriety and access to psychiatric treatment."[7] [AR at 35-36.] She found that plaintiff's "credibility is further diminished as a result of these inconsistencies." [AR at 36.]

Plaintiff argues that his "mental deterioration is not caused by the use, but the deterioration causes the use." [JS at 33.] He further argues that none of the reasons provided by the ALJ is clear and convincing, and defendant counters those arguments.[8] The ALJ must also reconsider

---

[7] It is assumed that "normalization of mental status examinations and behavior" at the time an inpatient facility discharges a patient would be the goal of *any* inpatient treatment. The ALJ linked plaintiff's decompensations to his substance use and then attributed his mental status at the time of discharge to the treatment he had received and the fact that he did not have access to drugs during treatment. (See also supra note 5 (discussing SSR 13-2p)). But the ALJ cites to no record from a *treating* provider that suggests or supports any "link" between plaintiff's substance use and his decompensations. As such, plaintiff suggests that it is clear that it was his bipolar disorder or other mental health issues that led to his substance use, noncompliance with prescribed medications, and resulting decompensation, and not the other way around.

[8] For instance, defendant argues that the ALJ's assessment of plaintiff's testimony is "fully supported by the observations of a number of doctors including medical expert Dr. Malancharuvil[,] [who opined] 'that [plaintiff] is notoriously unreliable in reporting about his drug use because he has denied using drugs to doctors, and he has denied using when he has been found positive.'" [JS at 36 (citing AR at 31).] However, this was not explicitly a reason given by the ALJ for discounting plaintiff's testimony; the ALJ merely included it in a summary of Dr. Malancharuvil's testimony. [AR at 31.] Dr. Malancharuvil also testified that "[p]eople who use drugs in the way [plaintiff] has used, I'm not totally, but I'm clinically certain that they are not necessarily straightforward in their reporting." [AR at 79.] Dr. Malancharuvil's statements stand in stark contrast to the Administration's recognition that in cases involving substance use, "[a]djudicators *must not presume* [as Dr. Malancharuvil appears to have done in this case] that all claimants with DAA are inherently less credible than other claimants." SSR 13-2p, 2013 WL 621536, at * 13. To support her assessment of plaintiff's subjective symptom testimony, the ALJ cites to a record reflecting plaintiff's statement that he was "sober from illicit drugs since 8/2011" [AR at 1731] as being refuted by other records showing positive testing for THC in September 2013 [AR at 31 (citing AR at 1849, 1911, 1997)], and positive for amphetamines in September 2013. [AR at 31 (citing AR at 2801).] The problem with the ALJ's reasoning, however, is that at least one of the records she cited to as showing a positive test result for THC (AR at 1849) did not reflect *any* testing, and another (AR at 1911) noted only that the result for THC was "Positive Unconfirmed." More importantly, plaintiff's statement that he had been sober since August 2011 was made on November 23, *2012*, and the tests cited to by the ALJ that allegedly refuted plaintiff's statement were all conducted almost a year *later*, in 2013. Additionally, notwithstanding Dr. Malancharuvil's and the ALJ's suggestions to the contrary, there are numerous records reflecting that plaintiff *admitted* to substance use during his treatment visits. [See, e.g., AR at 803, 993, 1027, 1054, 1061, 2773, 2799.]

on remand, pursuant to SSR 16-3p,[9] plaintiff's subjective symptom testimony and, based on his reconsideration of plaintiff's RFC, provide specific, clear and convincing reasons for discounting plaintiff's subjective symptom testimony if warranted.  See Trevizo, 871 F.3d at 678 n.5; Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1103 (9th Cir. 2014) (citation omitted) (the "ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.'"); Brown-Hunter, 806 F.3d at 493-94.

With respect to lay witness testimony, plaintiff contends that the ALJ failed to properly consider the lay witness written statements of social worker Kathleen Donovan, and plaintiff's mother, Laurel Emery.  [JS at 39 (citing AR at 674-81, 702-09).]  He notes that the ALJ did not discuss or address this evidence and the error was not harmless because the symptoms described by both witnesses would preclude full-time work.  [JS at 41.]  Defendant responds that Ms. Donovan's Third Party Function Report was completed around February 2006 at a time that plaintiff was hospitalized, and the ALJ in the May 2013 decision (which the ALJ in the decision at issue here incorporated by reference), stated that "the social worker offered no comment on the principal issue of substance abuse and seems unaware of [plaintiff's] substance abuse issue."  [Id.]  Moreover, that statement focuses on a period when plaintiff had been "off his medications and on a three-month methamphetamine binge . . . ."  [Id. (citing AR at 28, 290, 674-81).]  Defendant notes that Ms. Emery's statement was rejected by the previous ALJ for the same reasons.  [AR at 42 (citing AR at 28, 290, 702-09).]

On remand, the ALJ must also specifically consider the statements provided by Ms. Donovan and Ms. Emery.

/

/

---

[9]    The Ninth Circuit in Trevizo noted that SSR 16-3p, which went into effect on March 28, 2016, "makes clear what our precedent already required:  that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'"  Trevizo, 871 F.3d at 687 n.5 (citing SSR 16-3p). Thus, SSR 16-3p shall apply on remand.

**VI.**

**REMAND FOR FURTHER PROCEEDINGS**

The Court has discretion to remand or reverse and award benefits. <u>Trevizo</u>, 871 F.3d at 682 (citation omitted). Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. <u>Id.</u> (citing <u>Garrison</u>, 759 F.3d at 1019). Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate. <u>See</u> <u>Garrison</u>, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made. In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings. First, because the ALJ failed to provide specific and legitimate reasons for discounting the opinions of Dr. Mallare, Dr. Speare, and Dr. Hedrick, the ALJ on remand shall reassess the opinions of these physicians, as well as the medical opinion evidence generally. In assessing the medical opinion evidence, the ALJ must explain the weight afforded to each opinion and provide legally adequate reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally sufficient explanation for crediting one doctor's opinion over any of the others. Second, the ALJ shall determine the materiality of plaintiff's substance use in accordance with SSR 13-2p. Third, in accordance with SSR 16-3p, the ALJ shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony. Finally, if warranted, the ALJ shall reassess plaintiff's RFC and determine at step four, with the assistance of a VE if necessary, whether between August 31, 2003, and October 15, 2013, plaintiff was capable of performing his past relevant work as a stock clerk.[10] If plaintiff is not

---

[10] Nothing herein is intended to disrupt the ALJ's finding that beginning October 16, 2013, plaintiff was unable to perform his past relevant work as a stock clerk.

so capable, or if the ALJ determines to make an alternative finding at step five for that time period, then at step five the ALJ shall determine, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the regional and national economy that plaintiff can still perform after October 16, 2013, as well as from August 31, 2003, through October 15, 2013.

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED: February 28, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE